1

1                UNITED STATES DISTRICT COURT FOR
                     THE DISTRICT OF MARYLAND
2

3   -------------------------x
    LIFE TECHNOLOGIES CORP,      :
4                Plaintiffs      :
                                 :
5                                :
    vs                           :Civil Action:RWT-10-3527
6                                :
    LIFE TECHNOLOGIES CORP.,     :
7   et al,                       :
                 Defendants.     :
8   -------------------------x

9                              Monday, March 12, 2012
                               Greenbelt, Maryland
10
          The above-entitled action came on for a Motions
11  Hearing efore the HONORABLE ROGER W. TITUS in courtroom
    2C, commencing at 11:35 a.m.
12

13        **APPEARANCES:**

14        **On behalf of the Plaintiff:**
          ERIC M. JAEGERS, Esquire - Pro Hac Vice
15        SARAH D. MANN, Esquire - Local Counsel
          11682 El Camino Real, Suite 400
16        San Diego, California  92130

17

18

19

20

21

22

23

24
    Tracy Rae Dunlap, RPR, CRR          (301) 344-3912
25  Official Court Reporter

2

1                            **I N D E X**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                                      <u>Page</u>

25   Reporter's Certificate........................55

1        THE CLERK:  The matter now pending before this

2   court is civil docket number RWT-10-3527; Life

3   Technologies Corporation versus Life Technologies

4   Corporation, et al.  We're here for a motions hearing.

5        If I could please have counsel identifies

6   themselves for the record.

7        MR. JAEGERS:  Your Honor, Eric Jaegers, from the

8   law firm of Troutman Sanders, on behalf of the Plaintiff.

9        MS. MANN:  Good morning, Your Honor.  Sarah Mann,

10  from Bodie Dolina, on behalf of the Plaintiff as well.

11       THE COURT:  All right.  We're here for a hearing

12  on three motions:  The Plaintiff's Motion for Partial

13  Summary Judgment, the Plaintiff's Judgment for Sanctions,

14  and the recently filed Motion for Default Judgment.

15       I also want to note that I have received a letter

16  this morning from a principal of the Defendant

17  corporation; I've reviewed that.  It is -- I'll have it

18  made a matter of record, but it is not a pleading that

19  can properly be considered on behalf of the corporate

20  defendant.  The corporate defendant can only appear

21  before the Court through counsel.  There has been no

22  counsel entering an appearance, so we will proceed to

23  hear arguments on this matter ex parte.

24       Mr. Jaegers, who wishes to proceed first?

25       MR. JAEGERS:  Thank you, Your Honor.  We do have

1    these three motions pending.  I know that the Court is

2    very well versed in all of them, as well as the facts in

3    this matter.  Is there one that the Court would like me

4    to start with?

5             THE COURT:  Summary Judgment.

6             MR. JAEGERS:  Yes, sir.  Your Honor, there is in

7    the Fourth Circuit, just like every circuit, they're

8    almost identical, elements for showing liability for

9    trademark infringement.  Plaintiff here, and I will refer

10   to my client as "Plaintiff," since the names are

11   identical here.  I have to show that the plaintiff owns

12   the mark that is the subject of the lawsuit.  I have to

13   show that the defendant has used the mark in commerce and

14   without -- without authority or consent from the

15   plaintiff, and that the defendant's use is likely to

16   cause consumer confusion.

17            As to the first element.  Your Honor, there is no

18   dispute that the plaintiff owns the mark "Life

19   Technologies."  It has been using that, I believe, since

20   1999, and that's in the record under the Blankenbeckler

21   Declaration submitted with the Summary Judgment papers.

22   So there is no dispute that they own the mark.

23            There is also no dispute that the defendant used

24   the mark.  In Exhibit N, among other things, to the

25   Summary Judgment papers, it talks -- is a Web site used

1    to sell goods and services over the Internet.  It uses

2    "Life Technologies" throughout.  Notably, and this is

3    relevant on -- as it relates to any number of these

4    motions, Your Honor, at the very bottom it says "Life

5    Technologies, USA," not any Indian company that owns or

6    controls it.  It's "Life Technologies, USA."

7         There is also no dispute that the defendant did

8    not have authority, consent, or license from the

9    plaintiff to use the mark; that's in the Blankenbeckler

10   Declaration.  Certainly, there's no evidence submitted

11   that would prove otherwise.

12        Finally, Your Honor, on the third prong of this

13   test, the Consumer Confusion Test.  There are generally

14   six elements recognized by the Fourth Circuit.

15   Plaintiff's mark is strong and distinctive, which is

16   typically gauged through its commercial strength.  All

17   the evidence in this case submitted throughout the

18   Blankenbeckler Declaration and its attending exhibits

19   shows that it's -- I'm sorry, Your Honor.  The mark has

20   been in use since 1986.

21        Life Technologies has 50,000 products; 75,000

22   customers worldwide.  Its products are in 90 percent of

23   the laboratories in the United States.  It's a publicly

24   traded company.  Billions of dollars in revenues.  In the

25   last four years they've spent $150,000,000 advertising

that mark.  It's well known, enormously strong, and has a
lot of commercial strength, certainly, within the biotech
and Life Sciences industries.

Secondly, under this test, Your Honor, the Court
has to evaluate whether the Defendant's mark is similar
to the Plaintiff's mark.  Here, there is no doubt it's
identical.  "Life Technologies" is what the plaintiff
has.  The defendant has been using "Life Technologies."
It's in their corporate name.  It's how they do business.
That's how they present themselves to the world.  It's
all over the Web site.  It's all over the product
specimens submitted with their trademark applications.

Plaintiff has a registered mark for "Life
Technologies."  It's got pending registrations for Life
Technologies as well under different classes of
international classes.  And the -- Your Honor would see
the specimen submitted, the actual specimens submitted,
are slightly different as well.

In addition to Life Technologies, the defendant
has used several confusingly similar variants:  "Life
Tech" as two words; "LifeTech" as one word; "Life" in
connection with Life Sciences products, biotechnology,
and everything that would fall under "life" -- under Life
Sciences.  The variants used by Defendant are nearly
identical because they use "Life Technologies," maybe

1  with a design.  Maybe they use "LifeTech" with a design,

2  but they are confusingly similar.

3       And the similarity going to the issue, Your Honor,

4  with regard to the design is word end design marks.

5  Composite marks.  The similarity is gauged in terms of

6  appearance, sound, meaning, connotation, commercial

7  impression, and the similarity focuses on the word

8  portion of any mark.  The design portion is not the

9  dominant part of the mark, it's the word portion.

10 Because in speaking orally, people say "Life

11 Technologies."  They don't necessarily describe the

12 design portion of a mark.  So, the word -- and when

13 you're looking at it on the page, you're reading,

14 physically reading, the words "Life Technologies."

15       And courts, including the Fourth Circuit, just

16 across the board, focus on the word portion of any mark

17 such that even though the Defendant has variants of

18 Plaintiff's registered mark.  Those are also confusingly

19 similar for those reasons.

20       THE COURT:  Let me ask you this, then.

21       MR. JAEGERS:  Yes, sir.

22       THE COURT:  I've reviewed the papers, and I want

23 you to continue with your description, but my

24 understanding from the papers filed by prior counsel for

25 the defendant, which is essentially reiterated in the

1 papers that he -- the corporate president submitted to

2 the Court today, that they're willing to give up and

3 surrender.  And the real question is that you want too

4 much in an order.  So, along the way, make sure you

5 address that.  And it does not appear that they dispute

6 that there is an infringement of the mark.

7      MR. JAEGERS:  Your Honor, I don't think that they

8 do as well.  And I actually had -- in preparing for this

9 hearing here, you know, I was going to address the issue

10 -- basically what they've called our bullying of the

11 defendant.

12      THE COURT:  Well, over and over again I've seen

13 the David and Goliath argument being made.

14      MR. JAEGERS:  Yes, sir.

15      THE COURT:  You know, Davids are entitled to

16 enforce their rights against Goliaths, and Goliaths are

17 entitled to their right to enforce their rights against

18 Davids.  It doesn't make any difference to me that you're

19 big and the defendant is small.  The real question is,

20 has the defendant done something that requires the relief

21 that the plaintiff seeks and in scope that the plaintiff

22 seeks?

23      As I understand the defendant, they're arguing

24 that you want a scope that is beyond their ability to

25 give.  They contend that there's other entities that

1  they have no control over.  I think your response has

2  been, surely you must jest; these entities clearly are

3  related.  Clearly, things have been registered on behalf

4  of this LT-India by this defendant on behalf of that

5  corporation.  So, to suggest that he didn't have anything

6  to do with his nonsensical -- I think that's a summary of

7  what you're saying; is that correct?

8          MR. JAEGERS:  Your Honor, basically, yes.  But to

9  point to that issue right now -- I mean, we understand

10 what we can and can't get here.  I mean, we can't force

11 an Indian entity who is not a party here to give up

12 Indian trademark rights.

13         THE COURT:  You're addressing that in Indian

14 courts right now.

15         MR. JAEGERS:  We are.  What the defendant has

16 termed as "bullying" here really is more accurately cast

17 as Plaintiff trying to protect its rights.  Now,

18 Plaintiff has -- in the context of this lawsuit, Your

19 Honor, before we filed suit we tried to engage the

20 defendant and Dr. Krishnamurthy in settlement

21 discussions, and they forced us to file suit.  So we had

22 to file suit.  And we've gone through this and we have

23 propounded discovery.  We've tried to get a deposition.

24 All of that's been refused.  They haven't participated in

25 that way.  Now we're forced to confront these motions.

1   So, none of that is bullying.  That's Plaintiff, Life

2   Technologies, protecting its rights.

3        And in terms of trying to -- trying to settle.

4   And we have -- Your Honor, I cannot tell you how hard we

5   have worked to settle this case.  We started working back

6   last summer, through the fall, even into the winter.  I

7   know Your Honor is aware of -- I think we filed four

8   motions to continue or delay the time that we had to

9   respond to certain opposition -- reply to certain

10  oppositions.  And we just -- we haven't been able to

11  reach a settlement.

12       Part of that settlement is, yes, we would like --

13  in the settlement context, we would like to have a global

14  settlement and try to resolve all of these issues,

15  because we know very well -- even though we were denied

16  in the discovery process, we know very well that

17  Dr. Krishnamurthy is heavily involved with that Indian

18  company.  And despite what he says, he has control and

19  influence over that company, and that is marked

20  throughout the papers here.  He registers domains.

21  He's a director of the Indian company.  He is a director,

22  and his wife is a director as well.  I believe it's

23  called "Directress" in the formal Indian trademark

24  document we filed as Exhibit 2 -- I'm sorry, Exhibit 1 to

25  the Anderson Declaration to the supplemental letter

1  declaration that we filed.  So, in the settlement

2  context, we know very well what this Dr. Krishnamurthy is

3  able to do, and he's refused to do it and that's okay.

4  But that's why we're here today.

5        Also, we wanted Dr. Krishnamurthy to sign

6  individually on behalf of any settlement agreement here.

7  We wanted the corporation to be bound and we wanted

8  Dr. Krishnamurthy to be bound, and he refused to sign --

9  to be -- to agree to be bound individually.  So, in terms

10 of what we're trying to get in this lawsuit, we

11 understand the constraints that we're working under in

12 terms of what we can and can't get.  But in the

13 settlement context, we were trying to get the entire

14 thing taken care of as between the interested parties,

15 and it didn't happen.  We get that.  We're here to get

16 the relief that we think we're entitled to.

17        In the papers filed, Your Honor -- and I did

18 receive, about five minutes before the hearing this

19 morning, the same document that you mentioned earlier in

20 terms of what was filed with the Court.

21 Dr.  Krishnamurthy is here and handed that to me, and I

22 read it briefly.

23        THE COURT:  I didn't find anything new.

24        MR. JAEGERS:  I didn't find anything --

25        THE COURT:  It was very consistent with what his

```
 1   counsel had filed on behalf of the corporation

 2   previously.

 3          MR. JAEGERS:  I'm sorry?

 4          THE COURT:  It's basically Goliath is trying to

 5   crush David.  I wanted to give them everything they want,

 6   and they want more than I can give.  That's the short

 7   version, I think, of what it says.

 8          MR. JAEGERS:  It is, Your Honor.

 9          And in terms of what we are entitled to here.

10   Your Honor knows very well what we're entitled to.  But

11   in terms of -- I mean, you know, the case law and the

12   statutes say what we get.  The Federal Rules, though,

13   allow us -- as we discussed in the default motion, the

14   Federal Rules allow us to include as bound parties or, I

15   think, the term in the actual rule is "persons to be

16   bound by an injunction:  Officers, directors, owners,

17   agents of a company, and anybody in active concert or

18   participation with them."  That's the basis under which

19   we, obviously, filed our default motion, but that's also

20   the basis under which we were trying to get

21   Dr. Krishnamurthy to sign individually on behalf of -- I

22   mean individually under a settlement agreement.

23          So, what we're asking for is exactly what we're

24   entitled to.  And the fact -- I think a lot of the

25   attorney argument, even from his prior counsel, as well
```

1   as the document we received today, contains the issue of

2   settle- -- what we were asking for in settlement versus

3   what we're asking for in this lawsuit.  But in any event,

4   Your Honor, the defendant and Dr. Krishnamurthy have

5   refused to acknowledge liability before the case was

6   filed.  They refused to acknowledge liability, and they

7   forced us to sue them, and they still refused to engage

8   in any meaningful settlement discussions.

9        Basically, the defendant here is trying to force

10  us -- after forcing us to sue, they're trying to force us

11  to capitulate to their unilateral settlement demands, and

12  that's not the way it works.  And we didn't -- we gave

13  our own settlement demands.  They balked.

14       In fact, the last settlement agreement that I sent

15  after counsel disengaged on January 23rd, never heard a

16  word from Dr. Krishnamurthy.  I sent that on February

17  1st; still trying to do something with this case.  We

18  didn't get any red line version back or any comments.  No

19  discussion.  Radio silence, Your Honor.

20       Does that address your concern over that point?

21       THE COURT:  Yes.  I wanted to make sure you

22  understood.  I agree with you that, typically in a case

23  like this, an order is going to say that the defendant,

24  its officers, etcetera, other persons with knowledge of

25  this injunction, etcetera, are required to comply with

1   it.

2        MR. JAEGERS:  And that's exactly why we wanted him

3   to sign it.  We wanted his wife to sign it too and she

4   refused.  Then subsequently, Dr. Krishnamurthy also

5   refused.  And just in this context, Your Honor, just to

6   touch base on this a little bit more.  The document that

7   we received today.  May I, Your Honor?

8        THE COURT:  You may.

9        MR. JAEGERS:  The document that we received today

10  says that Dr. Krishnamurthy's wife -- if Your Honor would

11  give me a moment to locate it here.

12       THE COURT:  Take your time.  This is something you

13  just got, so I'm being very patient with you.  Don't

14  worry about it.

15       MR. JAEGERS:  Your Honor, in paragraph 10 on the

16  third page of the document that was -- well, it says it

17  was filed 03/09 of 2012 but which we got the day.  The

18  statement is, "My wife is not an owner or an officer or

19  an employee of this corporate entity," referring to the

20  Defendant.  "Hence, I plead her name should not be part

21  of this civil case at all."  Well, Your Honor, Exhibit 1

22  to the Anderson Declaration to the supplemental letter

23  briefs that we filed say that she's a director --

24  directress, I believe, of the Indian entity.  But that

25  document references Life Technologies, USA and then it

1  lists both of them.  She is intimately involved with the

2  defendant here.

3       Dr. Krishnamurthy's own declarations in this case,

4  the one submitted in opposition to our Summary Judgment,

5  says that my wife and I started the Defendant in, I

6  believe it's 2002.  And then I believe that's paragraph

7  five of his declaration, Your Honor.  Two paragraphs

8  Later, in paragraph seven, he says -- I don't have it in

9  front of me, Your Honor, so I'm going by memory.  But

10  paragraph seven, I believe, says in 2004 I and my wife

11  decided to change the name.  It's a joint effort by both

12  of them.  She's involved.

13       Your Honor, I'm not a Maryland attorney so I don't

14  know what the spousal rights are with regard to

15  ownership, and we don't have any discovery showing that.

16  But in any event, under Rule 65, she is an owner, an

17  officer, and an agent.  She falls squarely within that

18  definition, and I believe that's 65(B)(a) through (C) if

19  I am remembering right.

20       But Your Honor, I'll go back, unless you have any

21  other questions, to where I was.

22       THE COURT:  I'm looking at your proposed order.  I

23  take it your position is that where you requested the

24  Court enter an order ordering, one, and this is quoting

25  from your order, "Defendant and its employees, servants

```
 1   agents, dealers, attorneys, successors, and/or assigns,

 2   and all person in active concert with it/them," etcetera,

 3   that you would consider to be within the scope of that

 4   both the defendant and his wife.

 5        MR. JAEGERS:  Dr. Krishnamurthy, the defendant

 6   principal, and his wife.  Certainly.

 7        THE COURT:  Right.

 8        MR. JAEGERS:  Absolutely.

 9        THE COURT:  Okay.

10        MR. JAEGERS:  Your Honor, back on the likelihood

11   of confusion issue.  I believe we stopped off just short

12   of the third element, the third of six elements that the

13   Fourth Circuit generally considers, which is the

14   similarity of goods and services.  Defendant and the

15   Plaintiff are --

16        THE COURT:  There is no question that that's

17   satisfied here.

18        MR. JAEGERS:  Well, thank you.  You know, we cited

19   the Microsoft versus Gray computer case that says it's

20   rarely necessary to look beyond the mark to see if there

21   is infringement if they're in competition, which is

22   exactly the case we have here.

23        Fourth, Your Honor, did the defendant intend to

24   cause confusion?  I think that is not seriously in

25   dispute here, given the defendant and Dr. Krishnamurthy's
```

conduct.  I don't think there is any doubt that the

defendant and Dr. Krishnamurthy -- and Your Honor, if I

say "Dr. Krishnamurthy," I'm speaking of him as the

principal of the Defendant, unless I say otherwise.

THE COURT:  All right.

MR. JAEGERS:  There's no doubt that he knew about

the plaintiff.  They're in the same business and they

compete.  Dr. Krishnamurthy selected and continues to use

the identical mark, plus confusingly similar variants of

Plaintiff's registered mark.  Dr. Krishnamurthy, in his

declaration, and I believe it's paragraph three of his

declaration submitted in opposition to the Summary

Judgment motion, says he has a bachelor's degree in Life

Sciences, a masters degree in Life Sciences and a Ph.D in

Life Sciences.  His office is currently less than a mile

away from the plaintiff's former headquarters here in the

Baltimore-Washington area, Your Honor.

In addition, just in terms of intent -- and this

is a focal point in this case, Your Honor, and it will be

front and center on an Exceptional Case motion.  I don't

think that there is really any kind of serious dispute

that the defendant filed two trademark applications.  On

August 27th 2009 those were Section 1(a) applications,

not intent to use but already in use and commerce.  And

he represented in 2009 that he had been using them for

1  seven years already.

2       Two months later, in October, I believe it's

3  October 27th of 2009, Your Honor, the USPTO sends an:

4  "Office Action" to Dr. Krishnamurthy's attorneys giving

5  it an initial refusal to register his two applications

6  because of likelihood of confusion with the plaintiff's

7  marks.  Not just the plaintiff's -- and the plaintiff's

8  registered mark and two pending applications that the

9  plaintiff had at the time.  They referenced the numbers

10 and they gave exemplars, the actual specimens that the

11 plaintiff gave with its applications.  It gave those

12 specimens to the defendant.

13      Regardless, we think Dr. Krishnamurthy is a long

14 time Life Sciences business person.  He's a scientist.

15 We think he's known about Life- -- plaintiff Life

16 Technologies for many, many years.  But certainly,

17 certainly as of October 27th 2009, he was on notice and

18 that is not in dispute.  And what does he do?  He

19 continues to operate under the Life Technologies name

20 here in Maryland.  He continues to operate a Web site,

21 which is Exhibit N.  The pages that we printed off are

22 Exhibit N to the Blankenbeckler Declaration in support of

23 the Motion for Summary Judgment.  And then February 24th

24 2010, five months after he's on actual notice of our name

25 and marks and registration, our applications, he files

1    two more applications for the identical marks in

2    different international classes.

3        He has known, and he has continued to operate, and

4    it has been on purpose; it has been intentional.  I know

5    Life Technologies.  They're huge in this country.  Ninety

6    percent of the labs want to trade on their name.  That's

7    exactly what he has done for years.  It has been a

8    systematic, concerted effort by Dr. Krishnamurthy to do

9    this.  It has just been a pattern, just a series of

10   events, that when you step back, the pattern is I want to

11   trade on this well known name which is the plaintiff's

12   name, and the plaintiff has all rights to it.

13       Your Honor, just -- the fifth issue is whether the

14   defendant and the plaintiffs used the same trade channels

15   and the same mode of advertising.  There is no dispute

16   that both plaintiff and defendant used the Internet to

17   sell and advertise and promote their goods and services.

18   The Blankenbeckler Declaration sets that out very

19   clearly.  Just go to Life Technologies.com and you will

20   come up with the plaintiff's Web site.  If you used to go

21   Life-Technologies.com, you would see what you get at

22   Exhibit M to the Blankenbeckler Declaration which is the

23   same thing.

24       And going back also, Your Honor, to the intent

25   issue for just a second.  The applications that the

1   defendant has have a little design that goes along with

2   it, and it's basically an L, a white L -- it's in the

3   record, and it is in the proposed order on the default,

4   Your Honor, several times.  And it's got a little dot on

5   top of it.  If you -- Your Honor, if you turn to the

6   proposed order on the default, I think it's referenced in

7   there three times side-by-side.

8            THE COURT:  Oh, yes.  I remember that.  Yeah.

9            MR. JAEGERS:  Of those two images, those two

10  designs, the one without the dot on top of it is Life- --

11  plaintiff Life Technologies' old registration.  That's a

12  cancelled mark.  But the one without the dot, and it's a

13  very unique design; it looks like an L, a white L, inside

14  of a black circle, but the L is fanciful and could very

15  easily be construed as a double helix of a DNA strand

16  which fits right in line with the Life Sciences motif

17  and business that both the parties here are in.  Right

18  next to it you see the exact same design with a little

19  dot on top of it, and Dr. Krishnamurthy selected that.

20            I would submit to the Court that it is enormously

21  unlikely, if not absolutely impossible, that the

22  identical L-shaped -- L in a circle was created

23  separately without help by Dr. Krishnamurthy without help

24  from looking at the previous, either cancelled trademark,

25  or having known about Life Technologies over the years

1   actually using that mark before it was cancelled.

2        Now, throughout this case, Your Honor, and this

3   actually parallels and applies to several of these

4   different motions we have, you know, Dr. Krishnamurthy

5   has actively sought to pass the buck and push blame off

6   to any number of people.  He has alternately blamed his

7   lawyers for maybe not explaining to him the nature of a

8   Section 1(a) trademark application for use in commerce.

9   He has blamed the writer that he hired for an overly

10  optimistic or too rosy of a projection of the business of

11  the defendant in the newsletter that was also submitted

12  as a specimen in connection with those Section 1(a)

13  applications.

14       He blames his Life Tech India -- LT-India, the

15  Indian corporation.  He blames his partners for any

16  number of things.  He's not -- Dr. Krishnamurthy is not

17  responsible for the content on the Web site.  They sent

18  him specimens, pictures of specimens rather than actual

19  specimens.  The point is, Your Honor, he also, in this

20  instance, blames a graphic designer for just somehow or

21  another coming up with the perfect L in a circle with a

22  dot on top of it design for his applications.  At some

23  point, Your Honor, Dr. Krishnamurthy needs to be held

24  accountable for his actions, and there has to be some

25  invalidating consequence to what he's done.  So, in terms

1   of intent, there is a laundry list of things that point

2   to just a pattern of concerted, intentional effort to

3   trade on the plaintiff's mark.

4        Now, Your Honor, the last point in this likelihood

5   of confusion issue deals with -- at least as we've

6   addressed it in our papers, there are a number of

7   elements to the likelihood of confusion that the Fourth

8   Circuit recognizes.  But the point is not all of them --

9   any one of them can be dispositive.  I think what we've

10  talked about before is this unquestionably requires a

11  finding of trademark infringement liability.  But not --

12  the point is not all of the elements must be necessary in

13  order to find the likelihood of confusion.  We don't have

14  any evidence of actual confusion.  We don't have

15  testimony or a letter from somebody who bought one of the

16  defendant's products and said, oh, gee.  We thought they

17  were yours.  We were confused.

18        THE COURT:  The folks at the PTO found confusion.

19        MR. JAEGERS:  Yes, they did.  Yes, they did.  But

20  that typically, at least as far as my experience Your

21  Honor, doesn't satisfy the --

22        THE COURT:  I understand that.  But they have a

23  lot more experience in this field than I do.  I'll give

24  it whatever it's due.

25        MR. JAEGERS:  But the point is, Your Honor, that,

1  you know, certainly a lack of actual confusion carries

2  little weight.  The *Majestic Distilling* case, in addition

3  to numerous others in this circuit -- and I believe the

4  *Majestic Drilling* may be a Maryland case.  It sets that

5  out very clearly.  You don't need all of the elements

6  and, certainly, actual confusion.  Actual confusion.  In

7  my experience Your Honor, is icing on the cake.  If you

8  can get it, great.  If you don't, it means very little.

9         Your Honor, just to sum this up.  None of this has

10 been seriously disputed by the defendant.  There are

11 several statements in some of the filings that the

12 defendant has made that concede some of these things but

13 don't come out and say we concede everything.  This is

14 what we concede, you know, elements one through three and

15 then sub-elements one through six or nine or -- we don't

16 have that.  They've -- a general -- there's been a

17 general sense of concession on the defendant's part.

18        But since we're -- but we've been forced to come

19 here and, you know, present this to Your Honor.  And the

20 things that I've just gone over -- you know, to the

21 extent that the Court required any proof under the

22 default motion, the same elements we've just discussed

23 are also discussed in our default motion.  And the same

24 exhibits accompany the default motion for proof.

25        THE COURT:  All right.

1      MR. JAEGERS:  Your Honor, do you have any

2 questions?

3      THE COURT:  By the way, do you need a default if I

4 grant partial summary judgment?

5      MR. JAEGERS:  Your Honor, the default would -- we

6 would prefer the default.  The motion for partial summary

7 --

8      THE COURT:  The reason I'm asking is because there

9 is not a default in this case in the classic sense of an

10 answer to a complaint never having been filed.

11      MR. JAEGERS:  Yes, sir.

12      THE COURT:  And when the Court directs a

13 corporation, you know, to get a lawyer or you could, you

14 know, be risking default, it has to be with respect to

15 some future default as opposed to -- as of the date of

16 the order that I sent out saying hey, you need to get a

17 lawyer to represent you.  And if you don't, you risk

18 default.

19      There was no default as of the time of that order.

20 At that time of the order there were motions before the

21 Court that were fully briefed.  And now the defendant has

22 failed to appear through counsel today, which may or may

23 not constitute a default in and of itself.  But I don't

24 know why you could not get all the relief you want by

25 virtue of your motion for partial summary judgment.

1    MR. JAEGERS:  Your Honor, first of all, it is a

2  motion for partial summary judgment.  It does not address

3  Count One, which is a declaratory action for superior

4  rights in the mark.

5    THE COURT:  Correct.

6    MR. JAEGERS:  In which the default.

7    THE COURT:  In the future, if there is no

8  defendant defending of the case, there could be a default

9  entered on Count One, but I don't have something before

10  me that I think can serve as the vehicle to do that.  I

11  mean, for example, if you were to file tomorrow a motion

12  for partial summary judgment on that count and it wasn't

13  responded to, they're in default and I take it as

14  conceded.  That could be done.

15    MR. JAEGERS:  Your Honor, we are happy to do that

16  if Your Honor does not grant the default.

17    THE COURT:  Yeah.  I don't think default is

18  really, at least at this moment in time, the right

19  nomenclature that I should use in terms of anything other

20  than what's in the summary judgment motion.  The summary

21  judgment motion I'm satisfied, and I want to hear the

22  rest of your arguments, that it's well-founded.  There

23  are some issues relating to it that you've raised in

24  terms of fees and sanctions and so forth.  But in terms

25  of the raw question of, is there an infringement or not?

1   I think that's fairly well established in your motion for

2   partial summary judgment.  And the relief that you've

3   requested, as framed in your motion and in your proposed

4   orders, is fairly extensive in terms of using the marks

5   and being enjoined from prosecuting a trademark

6   application, being enjoined from using the marks, and so

7   forth.

8          All the things that are set forth in your proposed

9   order I'm fairly comfortable with.  Well, there's a

10  couple of exceptions I'll talk to you about in  about a

11  minute.  But I think in terms of disposing of matters

12  today -- we can't dispose of the whole case today because

13  there's a lot of things that are still down the road.

14  You've only asked for summary judgment on the particular

15  matter before me, not all counts.  There's also questions

16  as to if, for example, fees are to be awarded.  There

17  needs to be documentation submitted to the Court for its

18  review, and we need to talk about some of the scope of

19  the relief you're asking for.

20         I just wanted to put that on the table in terms of

21  whether default is the right thing to talk about.

22         MR. JAEGERS:  Well, Your Honor, the CDN Management

23  case -- *CDG Management* case which I provided a copy to

24  the Court and also left a copy for Dr. Krishnamurthy on

25  his table as well.  But that case factually parallels the

1  current case almost one for one.  Plaintiff answered.

2  I'm sorry.  The defendant answered in that case.  They

3  subsequently had their lawyers withdraw.

4       THE COURT:  Which case was it?

5       MR. JAEGERS:  The *CDG Management*, Your Honor.

6       THE COURT:  Okay.

7       MR. JAEGERS:  Your Honor, that was also Exhibit 1

8  to my declaration to the default.

9       THE COURT:  Okay.  All right.  I'll get that out.

10 Okay.

11      MR. JAEGERS:  Your Honor, yes, it was Equal

12 Employment Opportunity Commission versus CDG Management.

13      THE COURT:  That's why it is -- okay.  That's why

14 I couldn't find it.

15      MR. JAEGERS:  That is a District of Maryland case

16 decided just about a year and a half ago.

17      THE COURT:  I was looking at the wrong place.

18 Yeah, I got it.

19      MR. JAEGERS:  Factually it's very similar, and

20 it's highlighted on the page there.  Defendants answered.

21 It's the second page, Your Honor.  Defendants answered

22 the plaintiff's complaint.  They had counsel.  The

23 counsel withdrew, and the Court granted the motion to

24 withdraw on the same day it was filed.  Then the Court

25 issued an order directing defendants to enter an

1    appearance on behalf of the corporate defendants within

2    30 days in order to comply with Local Rule 101.2.b which

3    requires a corporation to be represented by counsel.

4         The defendants were notified that a failure to

5    comply with the Court's order could result in the

6    imposition of sanctions or the entry of default judgment.

7    Defendants failed to comply with the order requiring an

8    entry of an appearance on behalf of the corporate

9    defendants, and that case resulted in a default.  Those

10   are the identical facts to what we have here, an

11   answering defendant refusing to engage in the case,

12   basically.

13        THE COURT:  Okay.

14        MR. JAEGERS:  And that *CDG Management* case, Your

15   Honor, it uses the terminology "halting or arresting" the

16   litigation process.  That's essentially what has happened

17   here.  So, I do think that default is appropriate in this

18   case.  You know, if Your Honor disagrees then obviously

19   we'll be happy to --

20        THE COURT:  No.  I'll make sure I look at that.

21        MR. JAEGERS:  Okay.

22        THE COURT:  Thank you.

23        MR. JAEGERS:  Your Honor, the issues on the

24   default, as I mentioned earlier, are very similar to the

25   issues that we just discussed in the summary judgment.

1  And we have talked briefly about Dr. Krishnamurthy and

2  his wife being covered by any injunction.  If the Court

3  needs any further discussion on that --

4         THE COURT:  No.

5         MR. JAEGERS:  -- you know, I'm happy to discuss

6  that.  Your Honor, that leaves the issue of the sanctions

7  that we filed as a Rule 56(H) motion.  Under 56(H), which

8  replaces Rule 56(G) that was discussed in a lot of

9  previous cases --

10        THE COURT:  They would have to re-letter the rule

11 and drive us nuts.

12        MR. JAEGERS:  Of course.  Of course.  But I just

13 mention that.  Because when I first started reading, it

14 took me a second to make sure I was talking about the

15 same substantive concept of law.  But if there's bad

16 faith by a party, or delay, the Court can order expenses,

17 including attorneys fees, and can order contempt and

18 other sanctions.  Dr. Krishnamurthy's litigation

19 misconduct, Your Honor, is not limited to a failure to

20 engage in this case.  Maybe his failure to engage in

21 discovery:  He flatly refused to respond to the written

22 discovery request and wouldn't give us a deposition date.

23        It goes significantly further to the point where

24 he submitted a false affidavit under oath to this court

25 in opposition to our summary judgment.  There is several

1    -- it's not just one false statement, Your Honor, there

2    are many.  Let me address the first.  At paragraph 10 and

3    paragraph 14 of his declaration, he states that the

4    defendant has not transacted any business in the United

5    States under the name "Life Technologies."  That's false

6    and here is why.  As we discussed earlier, the two

7    trademark applications that he filed in August of 2009

8    were Section 1(a) applications:  I am currently using

9    these in commerce.

10         And the exhibits -- Your Honor, I believe they are

11   Exhibits Q and R to the Motion for Summary Judgment.  If

12   you thumb through the pages that are in those exhibits,

13   you will see -- we've highlighted some of the information

14   there, but you will see the basis under which they're

15   filed.  It's 1(a).  And you will see that when you file a

16   1(a) application, there is always a field that you have

17   to fill in.  Because if you're representing to the USPTO

18   that you are currently using them in commerce, they want

19   to know how long.  And every single one was entered 2002,

20   I believe it was at least 2002, seven years before the

21   applications were filed.  That is a flat out proactive

22   representation to the USPTO.

23         Your Honor, it's important to note that under 15

24   U.S.C. Section 1051(A)(3)(b), applications to the USPTO

25   are made under oath.  You are swearing to the USPTO that

the statements in your application are accurate.  He

didn't file one, he filed two with those applications.

As we discussed earlier, if you're going to file a use in

commerce, the USPTO wants to know what yours looks like

and how you're going to use it; how you've been using.

The specimens that he submitted are -- I can't

remember the Exhibit number, Your Honor, to the

Blankenbeckler Declaration to our sanctions motion.  I

want to say it's Exhibit 1 or the first exhibit.  He

submitted 15, maybe 20 pages of color photographs of

actual specimens with his corporate address, and Your

Honor you will note that there are two addresses.  One is

the Treble Court that he currently uses, and the other is

a Bauer Avenue or a Bauer Road, I believe.  The

expiration dates on the ones that use the Treble Lane

[sic] are roughly 2010, 2011.  You can just look at that

right on the product.  The ones that use the Bauer Road

address, the expiration dates tend to be around 2003.

So we don't know this, but we suspect that the

Bauer Road address was simply a previous address for the

defendant.  In any event, those products are Maryland

addresses submitted by the defendant to the USPTO as

actual specimens of products in commerce since 2002, and

these were submitted August 2009.

Another document submitted in support of both

1   applications, Your Honor, were various newsletters.  Now,

2   the one that we have included as Exhibit N to the

3   Blankenbeckler Declaration to our summary judgment,

4   that's just one of the newsletters.  In that newsletter,

5   active voice statements.  Not, we are going to do this

6   once we get running.  These are statements of we are

7   currently doing this.  We are -- Defendant is engaged in

8   drug development, etcetera.

9        Today -- here is a quote, Your Honor.  "Today we

10  are" -- defendant is recognized -- "Today we are

11  recognized as a leader in all of these different things

12  in the USA."  The newsletter talks about customers, the

13  implication obviously being that we have current

14  customers.

15       Now, the defendant also maintains an ongoing

16  business and has done so since 2002 or whenever the

17  company started.  The point being, Your Honor, in terms

18  of transacting business.  These actual specimens, the

19  newsletter and the sworn statements to the USPTO,

20  undeniably show that he has been transacting business.

21       The second false statement, paragraph 12 and

22  paragraph 14 of Dr. Krishnamurthy's declaration, the

23  defendant has no products and offers no services.  Your

24  Honor, I refer right back to the specimens and the

25  newsletters submitted with the Section 1(a) applications

1    filed in August 2009.

2         The third false statement.  Now, the opposition

3    states that defendant "had no awareness of Plaintiff's

4    existence prior to receiving the cease and desist letter

5    in late 2010."  That's the opposition at Page 11.  Since

6    -- and Dr. Krishnamurthy's deposition at paragraph 20

7    says, "Since learning of Plaintiff's existence and being

8    served with the complaint," he basically is inferring --

9    he doesn't come right out and say the very first time I

10   ever heard of the plaintiff is when I got the cease and

11   desist letter but that strongly -- that paragraph 20 of

12   his declaration strongly indicates that he is claiming to

13   the Court, in support of his opposition, that he didn't

14   learn of Plaintiff's existence until he was served with

15   the complaint.

16        And as we've discussed, Your Honor, August 27th --

17   and Your Honor, the complaint was filed in November -- I

18   believe December of 2010.  The cease and desist letter

19   which, I believe, is Exhibit L to the Blankenbeckler

20   Declaration.  It's either Exhibit L or Exhibit M, I want

21   to say, of November of 2010.  So, he had a month.

22   November 2010 is when he's basically claiming that's the

23   first time I ever heard of plaintiff.  Yet he's on actual

24   notice a year earlier, in October of 2009, when the USPTO

25   sent him an initial refusal for his two applications

1  because of the plaintiff's marks, referenced Plaintiff,

2  referenced Plaintiff's registration and pending marks,

3  and gave him actual specimens of the plaintiff's pending

4  marks -- pending applications.

5       And then again, August 23rd of 2010, the USPTO

6  issues notices of suspension of his August 27th 2009

7  trademark applications, and it references both of

8  Plaintiff's pending trademark applications.  So he at

9  least -- in addition to the fact that he is a Life

10  Sciences person with a bachelors, a master's, and a Ph.D

11  in Life Sciences, he's claiming that the first time he

12  learned of Plaintiff was getting the cease and desist

13  letter in November of 2010.  And the facts undeniably

14  show that he was aware, at least as of October 2009, of

15  actual notice because he had in his possession actual

16  specimens of the plaintiff's pending registrations.

17       And despite what he -- what he knew in October of

18  2009 he proceeds to file two more trademark applications

19  for the identical marks, just under different

20  international classes.  An on June 7th 2010, the USPTO

21  issues office actions which are Exhibit H -- Exhibits H

22  and I to the Blankenbeckler Declaration initially

23  refusing the two February 2010 applications that he just

24  filed.  And both of those applications -- both of those

25  office actions also reference -- both of those offices

1   actions also clearly reference Plaintiff's pending

2   applications and also give him additional copies of the

3   plaintiff -- specimens that Plaintiff submitted, which

4   are Life Technologies.

5        Your Honor, Defendant selected the exact same name

6   as the plaintiff.  Exact same name.  It's not even "Life

7   Technologies, Inc."  "It's Life Technologies

8   Corporation."  The products and services are similar.

9   He's located a mile from Plaintiff's old headquarters.

10  He adopted one of Plaintiff's old trademarks, the circle

11  with the L and "Life Technologies" under it.  It's just

12  not credible that he did not know of Plaintiff's

13  existence before he got that cease and desist letter or,

14  in fact, when he filed any of the four trademark

15  applications that he filed.

16       Additionally, the fourth statement, Your Honor,

17  and this regards the Web sites.  Your Honor, would you

18  excuse me so I can get a glass of water?

19       THE COURT:  You may.

20       MR. JAEGERS:  Thank you.

21       The fourth statement, Your Honor, and this deals

22  with the Web sites.  The two -- there are any number of

23  Web site domain names out there that the defendant either

24  owns or controls or that he claims that the LT-India, the

25  Indian corporation, owns or controls.  But with regard to

1    two of them, specifically, www.Life-Technologies.com and

2    then www.LifeTechnologiesCorp.com, he admits that he

3    registered both of those names, although he says he did

4    it on behalf of the Indian company.  He states that he

5    just -- he doesn't have control over LT-India.  I'll just

6    refer to that as "LT India," Your Honor.

7         He claims that he doesn't have any control; he was

8    a passive investor, a minor investment of, I think he

9    testified in his declaration, $600.  We have no way of

10   knowing if that's true or what level of control he

11   received for that.  We don't know what anybody else of

12   his Indian partners contributed.  $50?  $10?  We don't

13   know.  Nonetheless, he says that he doesn't have control,

14   can't influence, and yet his declaration says, well, I've

15   persuaded my Indian partners to give up some of these

16   domain names but  not others.

17        He claims that he facilitated the disabling of

18   some of these Web sites, Your Honor.  He himself.  If he

19   doesn't control or he can't maintain, how is it that he

20   is able to have the authority and the power to disable

21   some of the subject Web sites?  Exhibit N, Your Honor, to

22   the Blankenbeckler Declaration are the colored screen

23   shots of the first Web site address that I just

24   mentioned, Life-Technologies.com.  Now, we don't have

25   anything from LifeTechnologiesCorp.com.  We don't have

1   any screen shots of that.

2       Exhibit N is Life-Technologies.com.  He

3   facilitated the disabling of that Web site according to

4   his testimony and his declaration.  This is selective --

5   Your Honor, he is selectively choosing whatever will

6   benefit him here as to what he says he has power and

7   control to do with regard to all of these Web sites.  He

8   claims LT-India owns these Web sites and maintains and

9   controls them yet, as we'll see in a minute, he's a

10  director of LT-India, as is his wife.

11      Exhibit One to the Anderson Declaration to the

12  supplemental letter brief that we submitted unequivocally

13  says that the American Life Technologies company has a

14  representative office in India at the same address as

15  LT-India, represented by the same lawyer.  He has power

16  to control the disposition of trademarks for LT-India.

17  He can select their lawyers.  He can control the lawyers.

18  He basically controls the litigation, the litigation that

19  we discussed earlier and that has been mentioned in a lot

20  of these filings, Your Honor, on behalf of LT-India.  The

21  defendant controls the litigation through his agent, and

22  I believe it's Mr.  Boljonoki [ph.], and I'm undoubtedly

23  not saying that name correctly.  But he used the

24  Life-Technologies.com address to advertise his company.

25      Bear with me for one moment, Your Honor.

1          Your Honor, Exhibit N to the summary judgment

2    motion, it has the mark "Life Technologies" and "Life

3    Tech" both with and without that specialized design all

4    throughout.

5          THE COURT:  Right.

6          MR. JAEGERS:  But at the very bottom of every page

7    of Exhibit N it says "Life Technologies Corporation,

8    USA," and yet Dr. Krishnamurthy swears in his declaration

9    -- at paragraph 17 he says that the Life-Technologies.com

10   Web site is maintained by LT-India, and he and the

11   defendant are not responsible for the content of the Web

12   site.  And yet it says "Life Technologies Corporation,

13   USA" right here, Your Honor, right at the bottom of every

14   page.

15         Going back, Your Honor, to Exhibit 1 to the

16   Anderson Declaration which we submit with our

17   supplemental letter briefs.  That states Life

18   Technologies Corporation, a company incorporated under

19   the Indian Companies Act, which I would presume is

20   LT-India, represented by its director, Dr. Krishnamurthy

21   and his wife, having our office -- the Indian company has

22   its office at Life Technologies Corporation, 10135 Treble

23   Court, Rockville, Maryland, United States of America, and

24   also having our representative office in India.  LT-India

25   is part of the defendant.

1          Exhibit One.  This is a document from the Indian

2    Registrar of Trademarks.  Absolutely false that LT- -- he

3    doesn't have control over LT-India.  He can't main- -- he

4    has no control over the maintenance and what happens with

5    his Web sites?  He says in his declaration at paragraph

6    17 he's not responsible for the content of the Web site,

7    and yet Exhibit One to the Anderson Declaration basically

8    says that LT-India is part of the defendant USA company,

9    and Exhibit N has "Life Technologies, USA" at the bottom

10   of every page.  This is riddled with false statements,

11   his declaration.

12          And as we discussed earlier, Your Honor, he claims

13   that he mistakenly believed that the Section 1(a)

14   applications for trademark, the trademark applications

15   that he filed, the use and commerce applications that he

16   filed in August of 2009, were -- the specimens were to

17   show how future products were supposed to look and he

18   didn't know that they were required for actual -- to show

19   actual use in commerce.  And he says that at paragraph

20   five of his second declaration which is his opposition to

21   our sanctions motion.

22          He also says that he asked his partners at Life

23   Tech India for specimens and they sent him pictures.

24   Well what's troubling to me, Your Honor, is that if in

25   August 2009 when he filed those first two use in commerce

1    trademark applications, if he asked his Indian partners

2    for specimens of how future products would look, why do

3    most of those products have expiration dates of 2003, six

4    years before he requested anything?  These weren't future

5    products.  These were actual products in existence at the

6    time with Defendant's name, with Defendant's address.

7    These cannot be how future products would look if they

8    had an expiration date saying that the products expired

9    six years before he made the request.

10         Your Honor, I don't know how many of those

11   specimens were for the Bauer Avenue address with the 2003

12   expiration dates, but there are several.  Even the ones

13   for the Treble Court address have -- here is one, Your

14   Honor.  It's document 21-4, Page 9 of 34 and has a

15   manufacture date of April 2006.  That's three years

16   before he filed the trademark application and asked his

17   partners for specimens.  How can a product be

18   manufactured before it exists?  It existed at the time.

19   These are not future products.  His statement about the

20   belief that they were future products is just not true,

21   and it goes to a material issue in this case, Your Honor,

22   which is liability for trademark infringement.

23         Now we also discussed earlier, Your Honor, that

24   throughout this case, and this is perfectly shown by his

25   declarations, the one he submitted in opposition to our

1    summary judgment and also the one that he submitted in

2    opposition to our sanctions motion.  He has done all of

3    this conduct, this bad conduct, bad conduct with regard

4    to the trademark -- infringing our trademark; bad conduct

5    with respect to this litigation.  This is litigation

6    misconduct.

7          Independent of all the bad faith and bad intent

8    that he had with regard to purposely trading on our good

9    name and reputation, that's bad enough.  But then he

10   comes in to court, after forcing us to come here, and

11   engages in this litigation misconduct and submitting a

12   false declaration to the Court.  Every single point that

13   we've discussed Your Honor is material.  These aren't

14   just minor issues.  Everything we discussed goes straight

15   to the heart of our case, and he has blamed everything

16   everybody.  He's blamed his lawyers; blamed his graphic

17   designer; blamed the writer that he hired for the

18   newsletters submitted with his Section 1(a) application.

19   He blames his Indian partners for any number of things.

20   But the point is, Your Honor, he's got to be forced to

21   confront his conduct and suffer the invalidating

22   consequences.

23         Your Honor, do you have any questions about

24   anything that we've discussed or not discussed?

25         THE COURT:  No.  I think you've covered it quite

1    comprehensively.

2         The Court has before it today three motions -- you

3    can have a seat.  I'm just going to tell you what I'm

4    going to do.  One is a Motion for Partial Summary

5    Judgment as to liability for trademark infringement and

6    attorney's fees for exceptional infringement.  The second

7    is a Motion for Sanctions.  The third is a request for

8    default and a Motion for Default Judgment.

9         The factual circumstances of this case have been

10   fairly well laid out by counsel for the plaintiff today

11   and I will adopt his description of the facts for

12   purposes of this opinion.

13        The defendant would like to portray this as a

14   Goliath going after David case, and I just simply do not

15   agree with that.  Whether one party is bigger than the

16   other is really not the question.  The question is

17   whether somebody has violated U.S. Trademark law, and

18   it's clear to me that the defendant has done precisely

19   that and has done so willfully, and has attempted to

20   mislead this court.  The filings of this defendant before

21   the U.S. Patent and Trademark Office are hopelessly at

22   odds with sworn affidavits that he submitted to this

23   court and make the affidavit a sham in almost every

24   respect.

25        The plaintiff in this case is a corporation that,

obviously, is larger than the defendant corporation, but it has spent an enormous resources in developing its mark and its company.  It is a company with -- for example, in 2010 with $3.6 billion in revenue selling 50,000 products used by more than 75,000 customers around the world, and has spent considerably large sums of money, over $50,000,000 in 2010 alone, on promoting its products and specifically, of course, the marks in this case.

The defendant corporation was originally incorporated in Maryland in 2002 with the name Life Tech, Inc.  In 2004 it changed its name to Life Technologies, Inc.  Then followed it up in 2005 with a change to Life Technologies Corporation which is not close; it's exactly the same name as the name of the plaintiff.

It professes to have been unaware of the existence of the plaintiff, but the documentary evidence before the Court shatters any credibility of that contention.  This is clearly somebody who was out to and sought to utilize the name and the mark of the plaintiff and got caught, and caught by its own filings at the Patent and Trademark Office.  It's something that simply cannot be countenanced if our system of trademark protection in this country is to have any meaning whatsoever.

The plaintiff attempted to bring to the defendant into compliance with trademark laws on a pre-filing basis

```
 1   but was unsuccessful in reaching an agreement and filed

 2   the case in this court on December 10th 2010.  The

 3   parties have presented to the Court the three motions

 4   that I've previously mentioned, and I will now address

 5   the three motions.

 6        The Motion for Partial Summary Judgment is

 7   governed by Rule 56 which authorizes a court to enter a

 8   summary judgment if there's no genuine issue as to any

 9   material fact and the moving party is entitled to

10   judgment as a matter of law.  The motion in this case was

11   a motion for partial summary judgment.  That was not

12   addressed to the entire complaint but only to certain

13   portions of the complaint.

14        The Court is required to give the benefit of all

15   inferences to the non-moving party and I have done so.  I

16   find, though, there's little solace that the defendant

17   could take in the inferences that are permitted to it

18   under Rule 56 as the party opposing summary judgment.

19   The evidence here is overwhelming of infringement and

20   willfulness in doing so, and filing pleadings with this

21   court that are almost laughably false.

22        Counsel for the plaintiff has carefully addressed

23   the standards for infringement, which require proof that

24   it possesses a mark; second, that the defendant used the

25   mark; three, that the defendant's use of the mark
```

occurred in commerce; and four, the defendant used the

mark in connection with a sale, offering for sale,

distribution, or advertising of goods and services.  And

five, that the defendant used the mark in a manner likely

to confuse consumers.  There can be little doubt in this

case that all of those factors for a prima facie case

have been met, especially when the defendant is using the

exact same name that has been used by the plaintiff since

its inception and has been used by it to establish its

marks.

There have been efforts to resolve this matter

prior to this hearing; they have been unsuccessful.  I'm

not going to go into the question of whether one side or

the other was asking for too much or giving too little in

connection with those,    but it is clear to me that this

defendant has a significant connection with an Indian

company with a name similar to this, the LT-India, and it

is certainly appears to the Court that his relationship

with that company is quite significant and that he has

acted in a way to avoid the responsibility that he, his

fellow officers and employees and entities with which

he's affiliated have to the owners of the mark in this

case.

The plaintiff has addressed the factors for

injunctive relief which were most recently addressed by

1   the Supreme Court in the case of <u>eBay, Inc. versus</u>

2   <u>America Exchange, LLC</u>, a 2006 case in the Supreme Court.

3   In that case, the Court applied the more traditional

4   standards for injunctive relief to the arena of

5   trademark, and that requires a demonstration the

6   plaintiff risks suffering irreparable harm; monetary

7   remedies are inadequate to compensate the plaintiff's

8   injury; the balance of hardship or equities favors the

9   plaintiff; and the public interest would not be disserved

10  by an injunction.  There is little doubt in my mind that

11  all four of those factors are richly present in this

12  case.

13       While I recognize that the finding of irreparable

14  harm and trademark infringement cases was at one time

15  considered virtually automatic prior to the *eBay*

16  decision, in this case I'm satisfied that the plaintiff's

17  evidence has demonstrated the irreparability of harm

18  based on the facts of this particular case.  This is a

19  person who has utilized the exact same name as the

20  plaintiff, with an office in quite close proximity to the

21  plaintiff, selling the same services to the same

22  customers.  Obviously one is larger than the other, but

23  that's not a factor here at all.

24       The plaintiff has devoted enormous resources to

25  the development of its brand and its business throughout

1    the world and is not required to tolerate somebody

2    mimicking their exact same name with the exact same

3    products right in their backyard.  It is clear to me that

4    irreparability of harm is demonstrated factually in this

5    case, not just by virtue of the fact that it's -- that a

6    court concludes that a case of trademark infringement has

7    been found.

8         It is clear to me also that money damages are not

9    adequate, and that the balance of hardships and equities

10   heavily favors the plaintiff in this case.  There is a

11   very real threat of further infringement, especially in

12   light of the defendant corporations playing fast and

13   loose with facts and entities and other matters that give

14   the Court no confidence that there will not be further

15   injury to the plaintiff and that it's difficult to

16   calculate what it might be.

17        Finally, there's a heavy interest in preventing

18   trademark infringement, as protected by U.S. law.  And I

19   conclude, therefore, that the plaintiff is entitled to

20   injunctive relief.

21        The recovery of fees and costs is not automatic in

22   trademark cases.  Section 1117(A) of the Lanham Act

23   provides that in exceptional cases, the Court may award

24   reasonable attorney fees to the prevailing party.  Courts

25   have defined that to be one involving willful,

deliberate, fraudulent, or malicious conduct, and in the

Fourth Circuit, in the <u>Scotch Whisky versus Majestic</u>

<u>Distilling</u> case, must make a finding of bad faith.

If the Court does determine that the case is exceptional,

the matter of awarding fees is within the Court's

discretion.

          I conclude, on the basis of what I have before me,

that this is truly an exceptional case involving

demonstrated bad faith, and bad faith in the filing of

documents with this court as well.  I conclude,

therefore, that this is an exceptional case within the

four corners of Section 1117(A) and that fees are in my

-- within my discretion and should be awarded.

          I'll turn, then, to the Motion for Sanctions.  The

plaintiff has moved for sanctions and cites Rule 56(H)

which provides that if the Court is satisfied that an

affidavit has been submitted in bad faith or solely for

delay, the Court, after notice and reasonable time to

respond, and may order the submitting party to pay the

other party reasonable expense, including attorneys fees

it incurred as a result.  The offending party or attorney

may also be held in contempt or subject to other

appropriate sanctions.

          The Court also has the inherent authority under

the *Nasco* case in the Supreme Court to take appropriate

1   action when there have been actions taken in litigation

2   that are inappropriate and/or in bad faith.  In terms of

3   the standard of bad faith, courts have connoted that to

4   include an action taken with any colorable, legal, or

5   factual basis.  I think the emphasis here has to be on

6   factual basis in connection with an affidavit that is so

7   laughably false.  To make a finding of bad faith, the

8   Court is required to show -- it must be presented with

9   clear evidence of bad faith or vexatiousness.  I conclude

10  that has been done and done quite capably in this case.

11       I won't review in detail all of the statements

12  made by the affiant in this case on behalf of the

13  defendant corporation, but laughably incorrect or its

14  statement that it is has not transacted any business in

15  the U.S. under the name "Life Technologies," which is

16  completely at odds with what it told another agency of

17  the federal government.  Not this court but the U.S.

18  Patent and Trademark Office.

19       It also made the statement that it has no products

20  and offers no services, which is also contradicted by

21  documents filed with the U.S.  Patent and Trademark

22  Office.  And laughably false is the statement that he had

23  no awareness of Plaintiff's existence prior to receiving

24  the cease and desist in late 2010 which is absurd when

25  one looks at the facts of this case in terms of its

1    history.  But most importantly, looking at what happened

2    to the U.S. Patent and Trademark Office long before the

3    cease and desist letter was received.  He just plainly

4    got caught in a lie.

5          The Court finds his statements with respect to the

6    relationship with LT-India to be extremely suspect and

7    entirely at odds with the actions taken by that entity

8    and from the authorization form that he filed with the

9    Indian trademark office indicating he's a director of

10   LT-India and that the address of LT-India is, believe it

11   or not, Rockville, Maryland, the same address that of the

12   defendant corporation.

13         I conclude on the basis of all these factors that

14   I will grant all three motions in favor of the plaintiff,

15   I will enter an order that is similar but not identical

16   to what the plaintiff has submitted.

17         First of all, I will grant the Motion for Partial

18   Summary Judgment.  I will include in that order the

19   findings that were contained in the proposed order

20   submitted by the plaintiff, but with some exceptions.

21   First, I will, at several different places in the order

22   where it refers to "ordering the defendant and its

23   employees, servants, agents, affiliates, distributors,

24   dealers, attorneys, successors, and/or assigns," I'm

25   going  to insert the words, "including, but not limited

```
1    to the president of the corporate defendant and his

2    wife."  I will do that in paragraphs one and two of the

3    proposed order submitted by the plaintiff.

4          I will -- in a slight departure from paragraph

5    eight of the plaintiff's proposed order, I will provide

6    that the defendant shall be required by subsequent order

7    to pay plaintiff's costs, expenses and attorney's fees

8    incurred in the action.  Then I'll put a proviso in that

9    the plaintiff is directed to file an affidavit in support

10   of an award in conformity of Appendix B of the Local

11   Rules of this court on or before April 13.

12         Then with regard to the Motion for Sanctions, I

13   will grant that motion.  I will order that the

14   declaration of Krishnamurthy Govindaraj is stricken.  I

15   will also provide that the defendant shall be required by

16   subsequent order to pay to the plaintiff an award of

17   fees, and I'll put in the same proviso that the plaintiff

18   is directed to file an affidavit that conforms with

19   Appendix B of the rules of this court on or before April

20   13.

21         Finally, with respect to the default motion.  I'm

22   satisfied, having reviewed the case authority, that the

23   plaintiff provided that is an appropriate motion to

24   grant.  I, therefore, will grant it.  I will include in

25   the order the provisions that are in the proposed order
```

1    submitted by the plaintiff.  I will, however, make some

2    modifications to it.  In those places where it refers to

3    who's being ordered or enjoined, that are going to be

4    similar to those that I made when I mentioned the summary

5    judgment motion.  Namely, that I'm not going to mention

6    the president of the corporate defendant and his wife by

7    name directly, but I will -- when we get to the end of

8    the phraseology about officers, directors...accessors and

9    assigns, I'll put in, "including but not limited to"

10   those two individuals.  So they will be clearly covered

11   by it.  And that will be done in all the places where

12   that appears.

13          I believe that disposes of all the motions.  I

14   will be entering a very comprehensive order that includes

15   all of these and will be providing it to the parties.

16          This does not end the case, so we have need to

17   figure out what happens next.  We do need to address the

18   question of fees, and I'll have to consider what I get

19   from the plaintiff with regard to that.

20          As a result of granting the default, what's left

21   in the complaint?  I think that's it, isn't it?

22          MR. JAEGERS:  Your Honor, I don't believe there is

23   anything else.  There's no counter-claim.

24          THE COURT:  I think, then, the only thing that is

25   remaining is the fee award.  And you have also included a

1  requirement that the defendant account to the plaintiff,

2  and that you're entitled to treble damages.  We haven't

3  got that accounting yet, so I can't do an award of

4  damages until I get that.

5         MR. JAEGERS:  Your Honor, we have -- we're not

6  able to conduct discovery.  Interrogatories and document

7  requests were never responded to.  We don't have evidence

8  of --

9         THE COURT:  Well, what I will do is I will order,

10  then, that discovery be reopened for -- what period of

11  time would you like to have to get that done?

12         MR. JAEGERS:  Your Honor, I would normally say

13  maybe six or eight weeks.  But we were not able to have

14  success with cooperation when the defendant was

15  represented by counsel, and I'm not overly confident that

16  we'll have success now that he's not represented by

17  counsel.  Perhaps eight weeks?  Twelve weeks?  We can

18  report back to you if we're unsuccessful.

19         THE COURT:  Why don't I give you until July 13?

20         MR. JAEGERS:  That would be great, Your Honor.

21  Just to be clear, that is limited to plaintiff's

22  discovery only.  The defendant --

23         THE COURT:  I'm going to authorize that the

24  plaintiff is granted leave to conduct additional

25  discovery in support of an award of damages until July

1   13, 2012.  What I'm anticipating is after that discovery

2   is completed that you will submit something to the Court

3   in support of an award of damages, and any argument you

4   wish to make with the trebling would be appropriate

5   which, I assume, you take that position.

6        I want to make certain that since the corporate

7   defendant's president is here that I don't expect any

8   shenanigans with respect to discovery.  If he's noticed

9   for a deposition, he's required to appear.  I'm expecting

10   full compliance with the discovery processes of this

11   court, and we'll take appropriate actions if I conclude

12   that in any way, shape or manner that's being violated.

13        MR. JAEGERS:  Thank you.

14        THE COURT:  Thank you very much.

15        MR. JAEGERS:  Your Honor, I'm sorry.  I didn't

16   realize you were completely finished.

17        THE COURT:  I'm done.

18        MR. JAEGERS:  I just had a question I recall in

19   your Local Rules that motions for fees are due 14 days

20   after entry of judgment.

21        THE COURT:  No.  I just trumped that.

22        MR. JAEGERS:  I just wanted to make sure.

23        THE COURT:  That's been trumped.  Make sure you

24   read the Fourth Circuit case.  It's not coming to me

25   right now.  It's about a -- is it Equifax?  There's a

1   recent case in the Fourth Circuit that a lot of people

2   stumble over.  I think it's Equifax versus somebody, or

3   somebody versus Equifax that means you have to give some

4   indication that the fees are consistent with the market.

5   Okay?

6        MR. JAEGERS:  Yes, sir.

7        THE COURT:  Take a look at Appendix B, and then

8   take a look at that rule -- have a look at that case, and

9   I think you will see what needs to be put into any

10  request for fees.

11       MR. JAEGERS:  Okay.  Thank you.

12       THE COURT:  Thank you.

13                 (Off the record at 1:05 p.m.)

14

15                      **CERTIFICATE**

16       I, Tracy Rae Dunlap, RPR, CRR, an Official Court
    Reporter for the United States District Court of
17  Maryland, do hereby certify that I reported, by machine
    shorthand, the proceedings had in the case of LIFE
18  TECHNOLOGIES CORPORATION versus LIFE TECHNOLOGIES
    CORPORATION, Civil Action Number RWT-10-3527 on March 12,
19  2012.

20       In witness whereof, I have hereto subscribed my
    name, this 26tht day of March 2012.

21

22                 __/S/__Tracy Rae Dunlap__
                   TRACY RAE DUNLAP, RPR, CRR
23                 OFFICIAL COURT REPORTER

24

25